**Saundria BORDONE, Acting Regional Director of Region 9 National Labor Relations Board, Plaintiff,**

v.

**TALSOL CORPORATION, Defendant.**

**No. C–1–91–916.**

United States District Court, S.D. Ohio, W.D.

March 6, 1992.

■

---

Engrid Emerson Vaughan, N.L.R.B., Cincinnati, Ohio, for plaintiff.

Gary Lee Greenberg, James Allan Mills, Denlinger, Rosenthal & Greenberg, Cincinnati, Ohio, for defendant.

Peter Mark Fox, Kircher, Robinson, Cook, Newman & Welch, Cincinnati, Ohio, for movant.

## ORDER GRANTING TEMPORARY INJUNCTION

SPIEGEL, District Judge.

This matter is before the Court on the Plaintiff's petition and amended petition for a temporary injunction (docs. 1 and 28). The Plaintiff filed a Memorandum in support of its motion (doc. 21). The Plaintiff also has written a Proposed Findings of Fact and Conclusions of Law. This was

never properly filed with the Court. However, the Plaintiff delivered a copy to this Court and to opposing counsel.[1] Finding no prejudice, this Court attaches a copy to this Order of the Plaintiff's Proposed Findings of Fact and Conclusions of Law in order for the Plaintiff to make its record. The Defendant filed Proposed Findings of Fact and Conclusions of Law, as well (doc. 37).

The Plaintiff has also moved to amend its Petition for a temporary injunction to delete paragraph 5(v) alleging the unlawful discharge of Tina Pendergrass and to delete from paragraph 2(a) the request for affirmative relief for Ms. Pendergrass on the grounds that the matter is now moot. The Defendant has not objected to the Plaintiff's motion. Accordingly, the Plaintiff's motion to amend its Petition is granted.

The Court held hearings on this matter on January 17, 22, and 23 of 1992. Based upon the hearings and the material filed with this Court, we issue this Order.

## FINDINGS OF FACT

### Introduction

1. The Defendant, Talsol Corporation, ("Talsol" or the "Company") is located in Cincinnati, Ohio.

2. Talsol is in the business of manufacturing, selling, and distributing automobile paints, specialty chemicals, and related products.

3. The United Steel Workers of America, AFL–CIO–CLC (the "Union") filed a petition seeking to represent Talsol's production and maintenance employees.

4. James Newport, an employee of the Union, was in charge of promoting and organizing the Union at Talsol.

5. On March 24, 1991, the Union notified Talsol of its campaign to unionize the production and maintenance workers at Talsol. The Union informed Talsol that Sue Brewer, Curtis Compton, Velvie Wood,

---

1. The Defendant acknowledges in his Proposed Findings of Fact and Conclusions of Law (doc. 37) that "[o]n January 24, 1992, Petitioner served its proposed Findings of Fact and Conclusions of Law." Doc. 37, at 1.

Pam McNew, Betty Bates, Tina Pendergrass, and Judy Quillen were members of the Union organizing committee. These employees served as the Union's "eyes and ears" before the election on Union representation.

6. During the Union campaign, members of Talsol's management threatened workers with various reprisals if they supported the Union in the election.

7. On April 17 and May 2, 1991, the Union filed charges with the National Labor Relations Board (the "NLRB") alleging that Talsol had been engaging in unfair labor practices.[2]

8. On May 10, 1991, Talsol's workers held an election, resulting in 17 votes for the Union, 16 no votes, and 4 challenged ballots.

9. After the election was challenged, it was later determined that there were 20 votes for the union, and 17 against the Union. A Certification of Representation was issued on August 12, 1991.

10. The Plaintiff has made numerous allegations of unfair labor practices against the Defendant. This Court has grouped the allegations into these four areas: (1) failure to bargain; (2) worsened working conditions; (3) loss of employment; and, (4) work shut-downs.

### Failure to Bargain

11. No employees of Talsol received a wage increase in June, 1991. In previous years, some employees received merit-based pay increases in June.

12. Talsol informed the Union that "... it would hold off on individual merit increase reviews pending negotiation [with the Union]." Defendant's Hearing ex. 1, Letter from Gary L. Greenberg to James Newport, June 24, 1991. Talsol offered to negotiate with the Union on wages and other issues on August 28, September 3, and September 4, 1991. Defendant's Hearing ex. 5. The Union did not respond until October 18, 1991, when the Union offered to meet on various dates in late October

and early November. Defendant's Hearing ex. 6.

13. The Union and Talsol finally met on November 13, 1991. The two parties agreed to negotiate the language of the contract first, then the wages and benefits.

### Worsened Working Conditions

14. The aerosol line at Talsol produces cans of aerosol paint. Many, but not all, of Talsol's employees considered the work on the aerosol line to be the least desirable at Talsol.

15. Talsol has experienced numerous problems with the aerosol line. The aerosol line has never produced the number of cans that Talsol expected when it started the line.

16. Despite the fact that Talsol has never produced the number of cans expected, the workers on the aerosol line have experienced problems keeping up with the pace of work on the line.

17. The attitude of the supervisor on the aerosol line, Pete Burnside, changed after the Union election. From being a pleasant manager, Mr. Burnside became a very difficult person for whom to work.

18. In the fall of 1991, Talsol imposed more onerous working conditions on its employees on the aerosol line, including requiring employees to perform menial job tasks which were not a part of their regular work duties.

19. Talsol had four known Union supporters working on the aerosol line.

20. Talsol assigned some Union supporters to janitorial duty, despite the fact that Talsol has a janitorial service. These workers had never received janitorial duty before the Union campaign.

21. Talsol forced two workers to mop the President's parking space on a day of inclement weather.

### Loss of Employment

22. Talsol dismissed five employees who were Union supporters: Brewer, Wood, Fultz, Pendergrass, and Compton.

---

**2.** The Union also filed claims with the NLRB alleging unfair labor practices by Talsol on May 31, June 17, July 5, September 4, September 17, and November 25, 1991.

23. The Plaintiff offered no evidence as to why Talsol dismissed Brewer, Wood, and Fultz. The Plaintiff has withdrawn its allegation regarding Ms. Pendergrass' discharge.

24. Curtis Compton, the remaining discharged employee of Talsol, supported the Union campaign beginning in March 1991.

25. Mr. Compton was a paint-maker trainee. However, he repeatedly made paint incorrectly.

26. Talsol demoted Mr. Compton to warehouse worker.

27. On June 25, 1991, Talsol management informed Curtis Compton that his pay would be reduced $2.00 per hour. Mr. Compton then informed Talsol that he was quitting his employment.

28. Subsequently, Mr. Compton asked to return to work, but Talsol refused to rehire him.

### Work Shut–Downs

29. Following the Union campaign, Talsol informed its workers that the Company would shut down and employees would be sent home when the Company did not have enough work. Talsol had never had shutdowns before the Union campaign.

30. In the summer and fall of 1991, Talsol did have periodic days when it shut down and the employees did not get paid.

31. Subsequently, however, Talsol compensated these employees for days the Company had shut-down and sent its employees home. *See e.g.*, Defendant's Hearing ex. 18.

### Procedural History

32. The NLRB filed for a temporary injunction under the National Labor Relations Act, 29 U.S.C. § 151, *et seq.* (1991).

### CONCLUSIONS OF LAW

Congress designed the National Labor Relations Act (the "Act") in order to "... protect[] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. § 151.

■ When the NLRB believes that a "... person has engaged in or is engaging in an unfair labor practice[,] ..." the NLRB may petition a federal court for appropriate temporary relief or a restraining order. 29 U.S.C. § 160(j). For a court to issue a § 10(j) injunction under the Act, the Plaintiff must demonstrate two independent requirements. *Gottfried v. Frankel,* 818 F.2d 485, 493 (6th Cir.1987). First, the Court must find "reasonable cause" to believe that unfair labor practices have occurred. To establish the requisite reasonable cause, the NLRB has a relatively insubstantial burden. *Id.* Namely, the NLRB need not prove that an unfair labor practice occurred; instead, the NLRB must only produce some evidence in support of its position. *Id.*

Second, assuming reasonable cause exists, the Court must then determine whether injunctive relief is "just and proper." Moreover, "the relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power." *Id.* (quoting *Kobell v. Suburban Lines, Inc.,* 731 F.2d 1076, 1091 (3d Cir.1984)).

In order to determine whether to grant the Plaintiff its requested relief, we must decide whether the Plaintiff has met both of the independent requirements set out in *Gottfried* in order to grant the Plaintiff its requested relief. We have grouped the Plaintiff's allegations into four areas: (1) failure to bargain; (2) worsened working conditions; (3) loss of employment; and, (4) work shut-downs. The Court must now determine whether the NLRB has established reasonable cause to believe that Talsol engaged in unfair labor practices in any of the four areas.

■ The NLRB has not established reasonable cause to believe that Talsol failed to bargain. Talsol informed the Union that "... it would hold off on individual merit increase reviews pending negotiation [with

the Union]." Defendant's Hearing ex. 1, Letter from Gary L. Greenberg to James Newport, June 25, 1991. Talsol offered to negotiate with the Union on several dates in late August and early September. The Union did not respond to Talsol's offer until October 18, 1991. On October 18, 1991, the Union offered to meet on dates in late October and early November. From the evidence presented at this Court's hearing, Talsol was ready and willing to negotiate with the Union. The Union, on the other hand, was dilatory in beginning negotiations. Therefore, we conclude that the NLRB has not presented reasonable cause that Talsol failed to bargain. Moreover, Talsol established that its wage increases were discretionary and based upon an employee's merit.

■ The NLRB has presented reasonable cause to believe that working conditions worsened at Talsol after the Union election. Talsol assigned some Union supporters to janitorial duty, despite the fact that Talsol has a janitorial service. These workers had never received janitorial service before the Union campaign. Furthermore, Talsol forced two workers to mop the President's parking space on a day of inclement weather. These workers had never been asked to perform this duty before the Union campaign.

Finally in terms of working conditions, Talsol assigned Union supporters to the aerosol line. Many, but not all, of Talsol's employees considered the work on the aerosol line to be the least desirable job at Talsol. In the fall of 1991, Talsol imposed more onerous working conditions on its employees on the aerosol line, including requiring employees to perform menial job tasks which were not a part of their regular work duties. Talsol has also increased the speed of the cans on the aerosol line, although the aerosol line is still not producing up to the Company's expectations. Furthermore, the attitude of the supervisor of the aerosol line, Pete Burnside, changed after the Union election. From being a pleasant manager, Mr. Burnside became a very difficult person for whom to work.

In examining the change in working conditions as a whole, the Plaintiff has put forth some evidence that Talsol has engaged in a practice of making working conditions more difficult for Union supporters. Therefore, we conclude that the Plaintiff has shown reasonable cause.

■ Third, we must consider whether reasonable cause exists to find that employees lost their employment with Talsol because of their Union activities. The only employee in question is Curtis Compton, who was a paint-maker trainee. The evidence at trial was that Talsol demoted Mr. Compton, because he repeatedly made bad batches of paint. As a result of his demotion, Mr. Compton announced his resignation, although he subsequently asked to be rehired. In examining this evidence, we conclude that reasonable cause does not exist to find that Mr. Compton's Union activity was a contributing factor in his demotion.

■ Fourth and finally, we must consider whether there is reasonable cause to find that Talsol implemented work-shut downs in order to retaliate against workers for electing Union representation. Talsol had its first work shut-downs in the fall of 1991. Workers did not receive any payment for the time that Talsol was shutdown. Subsequently, however, Talsol paid its employees their wages for the days when the Company was shut down. Given the fact that Talsol had never implemented work shut-downs before the Union election, we conclude that reasonable cause exists to find that Talsol implemented work shutdowns in order to retaliate against workers for electing Union representation.

■ Having determined that reasonable cause exists to find that Talsol worsened working conditions and implemented work shut-downs, we must now determine whether an injunction is "just and proper" in light of Talsol's actions. *Gottfried*, 818 F.2d at 493. This Court has discretion in determining whether an injunction is just and proper. *Id.*

We turn first to worsened working conditions at Talsol. For nine months, Talsol

has made working conditions more onerous than they were before the Union election. We find that evidence exists that Talsol has taken these actions in order to intimidate and punish its workers for supporting the Union. In this case, injunctive relief is reasonably necessary to preserve the ultimate remedial power of the NLRB. *See id.*

Therefore, we order that Talsol will cease and desist from the following: (1) assigning known Union supporters to the aerosol line in disproportionate numbers in comparison to other workers; (2) assigning workers to tasks that far exceed the scope of their typical job duties, such as performing janitorial services or mopping the President's parking space. These orders are effective pending final disposition by the NLRB of the matters alleged in the amended petition.

■ Second, we must determine whether injunctive relief is just and proper for the work shut-downs that have occurred. Indisputably, Talsol did have work shutdowns following the Union election. However, Talsol has fully compensated the workers for the time they missed on the job. The Plaintiff presented no reasonable likelihood that Talsol will continue having work shut-downs in the future. Therefore, we conclude that injunctive relief is not necessary to preserve the ultimate remedial power of the NLRB.

In taking this action, the Court wishes to make clear that the matter before it is not closed. Rather, if subsequent events occur, the Plaintiff may bring them to the attention of this Court.

SO ORDERED.